OPINION
Defendant, Ronnie Price, appeals from a conviction for possession of crack cocaine. After Price was found guilty by a jury, the trial court sentenced him to one year in prison. Price now appeals, asserting the following assignments of error:
I. The judgment and verdict should be reversed because there was insufficient evidence to prove the element of possession.
II. Exhibit 2-B (a receipt) was inadmissible hearsay and it was prejudicial error to admit the exhibit.
After reviewing the record and the applicable law, we find the assignments of error without merit. Accordingly, the judgment of the trial court will be affirmed.
 I
The only witnesses who testified at the trial of this case were two officers who participated in Price's arrest. According to their testimony, Price was arrested on the evening of December 19, 1999, after he fled from officers who had tried to stop him for a traffic violation. On the evening in question, Dayton police officer, Jeffrey Huber, and his partner were driving eastbound on Germantown Pike, near the intersection of Stewart Street. Huber saw a white Honda run a red light in order to turn left on Germantown from Stewart. The white Honda then proceeded westbound on Germantown and passed the cruiser. Huber could see that only one person was in the Honda, but he could not get the license plate number. After making a U-turn, the cruiser began to follow the Honda. By the time the cruiser was able to turn around, two other cars were between the cruiser and the Honda.
After seeing the driver of the Honda commit other traffic violations, Huber decided to make a traffic stop. However, the driver did not stop, but instead tried to elude the police. At one point, the Honda turned left from an alley onto a main road without slowing down or stopping for traffic. The Honda then began driving down the left side of the road. Because it was raining, Huber told his partner to "back off." Unfortunately, the officers then lost sight of the car. The last time the officers saw the Honda, it was six or eight blocks ahead. The Honda then just disappeared. When the officers arrived at the intersection where they thought the vehicle had turned, they saw a black male running across an intersection about half a block away. Upon reaching that intersection, they saw vehicle debris all over the road. The white Honda was off the side of the road, and was crumbled and smoldering. At that point, Huber jumped out of the cruiser and ran after the suspect. By this time, the rain had stopped.
As Huber got out of the cruiser, he gave a description of the suspect as about 5'10" to 6', with dark clothing and a thin build. During the foot chase, the suspect ran into a field and went into an area between two houses (30 and 32 Willard). Huber followed, but lost the suspect because much debris was in the field. However, he did see another cruiser on the scene behind 32 Willard. Consequently, Huber broadcast his location as 30 Willard and said that he had lost the suspect. Huber also indicated that the suspect had to be nearby.
Officer Koogler of the Dayton Police Department was also on patrol that evening and helped look for Huber's suspect. As Koogler walked along the tracks, he saw a camper. He also saw a black male come out of a house and walk towards the camper. Because the man wore light clothing, Koogler knew he was not the suspect. Koogler saw the front of the camper door open about a foot. The door then closed when Koogler started walking toward the person in the light clothing. Koogler approached the man in the light clothing (later identified as Anthony Pope), and asked him who was in the camper. Pope said he did not know who was in the camper.
In the meantime, as Huber checked the front of the houses, he heard that Officer Koogler had seen someone shutting a trailer door in the back yard. As a result, Huber went between the two houses, into the back yard. At that time, he saw a piece of fence lying down in one spot between the houses. As Huber came through with his flashlight, he saw a green pager on the fence, on top of a plastic bag that contained what appeared to be crack cocaine. Although the grass and fence were wet, the pager and plastic bag were dry. The trailer was about 20 yards away from the fence.
At that point, Huber saw a tall black male with a tan hood standing with Officer Koogler beside the trailer. Huber grabbed the man (Pope), while Koogler went inside the trailer. Pope lived in the trailer and gave Koogler permission to go inside. When Koogler entered the trailer, he saw a man (later identified as Price) sitting on a bench seat. Price appeared to be out of breath and his clothing was wet. He also had trickles of blood on his face and particles of safety glass in his hair and on his clothing.
Upon being questioned as to why he was in the trailer, Price said he had been in the trailer all night. However, he did not know who owned the trailer, and gave no reason why he was there. After Koogler patted down and handcuffed Price, Huber identified Price as the person who had fled from the accident scene. Price was then taken to the hospital.
Huber field-tested the content of the bag and found that it was positive for cocaine. At the hospital, Huber asked Price if the pager was his, but Price denied ever seeing the pager. Later, Price was taken to the police station and the contents of his wallet were inventoried, per police procedure. At that time, Huber found a receipt in Price's wallet for activation of a pager. The receipt was not made out to Price, but some things were written on the receipt, including the number 282-1532. Huber asked his partner to call this number. Huber's partner called the number and put in a message (a series of numbers, i.e., 1, 2, 3, 4, 5, 6, and 7). About ten seconds later, the pager vibrated and the same series of numbers appeared on the pager. Price was then charged with possession of crack cocaine.
In the first assignment of error, Price contends that the evidence was insufficient to prove that he possessed the cocaine. When we consider challenges to the sufficiency of the evidence, we:
 examine the evidence admitted at trial to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt. The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt.
State v. Jenks (1991), 61 Ohio St.3d 259, 259-60, paragraph two of the syllabus.
In this case, Price was charged with violating R.C. 2925.11(A), which provides that "[n]o person shall knowingly obtain, possess, or use a controlled substance." Possession is defined as "having control over a thing or substance." R.C. 2925.01(K). Possession may be "constructive as well as actual." State v. Hankerson (1982), 70 Ohio St.2d 87, syllabus. Further, "[c]onstructive possession exists when an individual knowingly exercises dominion and control over an object, even though that object may not be within his immediate physical possession." Id. (citation omitted).
Price contends that he did not have possession of the crack cocaine because the cocaine was 20 yards away when he was arrested. Although Price concedes that constructive possession can apply, he argues that the facts of this case extend the doctrine beyond reasonable limits. Price also claims that the facts point just as strongly to the theory that Pope "possessed" the cocaine. Specifically, Pope was outside the trailer and admitted that he lived there. Price also cites evidence from one statement of facts (the police report) which allegedly indicates that Pope showed Officer Huber where the cocaine was located.
After viewing the evidence most favorably to the State, we believe a rational trier of fact could have found Price's possession of crack cocaine proven beyond a reasonable doubt. Based on the circumstantial evidence, a trier of fact could easily have concluded that Price hid the cocaine and pager as he ran from the police, and intended to retrieve them later. The fact which most strongly supports this theory is that the pager and cocaine were dry, even though the fence and ground were wet. Since the rain had stopped only very recently, these items obviously were not outside very long. At a maximum, they could have been outside only since the foot chase began, because that is when the rain stopped.
Although Price suggests that the cocaine and pager belonged to Pope, the evidence does not support that theory. Officer Koogler saw Pope come out of a house and walk towards the trailer. Koogler also had the chance to observe Pope's actions at a time when Pope was unaware Koogler was present, i.e., Koogler testified that he was down lower in the weeds and did not think that Pope saw him. In any event, Koogler did not indicate that he saw Pope drop or hide anything, nor did he ever place Pope in the area where the crack cocaine was found.
As an additional matter, the scenario required to establish Pope's ownership of the pager is highly improbable. First of all, Pope would have had to be acquainted well enough with Price for his pager activation receipt to be in Price's wallet, or for Price to have his pager number. However, no evidence was presented to show any connection between Pope and Price, nor was there any connection shown between Pope and the pager activation receipt. Another logical blow to this scenario is that Pope would have had to predict Price's encounter with the police, the unanticipated auto wreck, and the subsequent chase, which coincidentally ended up in Pope's own yard. Again, no evidence of such facts was presented. And finally, Price offers no reason why Pope would bring a pager and cocaine outside and leave them on a fence. Possibly, Pope could have had the objects and put them on the fence when he saw the police. However, no evidence placed Pope in that area of the yard.
An alternate theory, implied by Price at trial, is that Pope was the man the police were chasing. In this regard, Price focused on the fact that Pope was about the same height as the person being chased. In contrast, Price was only about 5'5" tall. Again, however, the known facts do not fit with the suggested theory. Specifically, Officer Huber testified that the height description was only an estimate. Since the suspect crouched over as he ran, Huber could not tell precisely how tall the suspect was. Second, Pope was dressed in light clothing that did not match the suspect's clothing. Moreover, Pope was not out of breath, was not breathing heavily, and did not run from the police upon being confronted. His clothing was also dry. Accordingly, we find no convincing evidence in the record that the pager and cocaine belonged to or were connected with Pope. As we said, the most plausible explanation is that Price hid the pager and cocaine while being chased by the police.
As a final point, we are hampered in assessing the defense claim about the alleged statement in the police report. Although the defense used the police report while questioning Huber, the defense did not proffer the report. Appellants clearly have a duty to properly preserve the record for review. See, e.g., State v. Evans (1994), 93 Ohio App.3d 121,124. Furthermore, while Officer Huber did testify briefly about the police report, his testimony was not particularly clear. From what we can glean, Officer Huber interpreted the report to mean that he talked to Pope as part of his investigation and then went to the fence location where he had already found the pager and the crack cocaine. Therefore, we see nothing to cast doubt on the sufficiency of the evidence of Price's guilt.
Admittedly, the evidence is circumstantial. However, "[c]ircumstantial evidence and direct evidence inherently possess the same probative value." Jenks, 61 Ohio St.3d at 259, paragraph one of the syllabus. Accordingly, since a rational trier of fact could have found that Price had constructive possession of the cocaine, the evidence was sufficient to prove the element of possession.
In light of the preceding discussion, the first assignment of error is overruled.
 II
The second assignment of error is based on the trial court's admission of the pager activation receipt (State's Ex. 2-B). Price claims the court erred in admitting the receipt because it was inadmissible hearsay.
Generally, trial courts have broad discretion in deciding if evidence should be admitted, so long as they exercise their discretion "in line with the rules of procedure and evidence." Rigby v. Lake Cty. (1991),58 Ohio St.3d 269, 271. We review evidentiary rulings for abuse of discretion, meaning that the trial court acted "unreasonably, arbitrarily or unconscionably." Id. After reviewing the record, we find no abuse of discretion, since the evidence in question was not hearsay.
Evid. R. 801(C) defines hearsay as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." A statement is "an oral or written assertion or (2) nonverbal conduct of a person, if it is intended by him as an assertion." Evid. R. 801(A).
Price contends that the number on the paper receipt was an out-of-court assertion, by an unknown person, that the pager belonged to Price. We disagree. We do not think the number on the receipt was a written assertion, nor was it nonverbal conduct that Price or anyone else intended as an assertion.
The number itself is meaningless, as is the issue of whether the pager, in fact, belonged to Price. The only relevance of the pager is that it was found on top of the crack cocaine, in a place where such items would not normally be found. Consequently, the implication arose that the two items, i.e., the pager and drugs, were placed there by someone and were connected. However, the number written on the receipt in Price's wallet made no statement or assertion of fact. To the contrary, the number was a neutral entity. It had no meaning until the police officer called the number and activated the pager that was in the police's possession. Thus, the relevant facts are that Price carried the number in his wallet, and that the number activated the paper when dialed by the officer.
In this regard, the present case is similar to State v. Earle (1997),120 Ohio App.3d 457 . In Earle, an officer noticed, while tagging information after a defendant's arrest, that a particular number repeatedly called the defendant's pager. The officer then set up a drug buy with the caller, and was allowed to testify about his half of the conversation. On appeal, the court found that the officer's recitation was not improper hearsay. Id. at 469.
Admittedly, the fact that the number was written on a pager activation receipt was more unfavorable to Price than if it had been written on a blank piece of paper. Nonetheless, the pager activation receipt was not admitted for the truth of its contents. In fact, the receipt was not even in Price's own name (although it was in the name of a Spano Price, who could have been related to Price). Accordingly, neither the receipt nor its content was inadmissible hearsay.
As an additional point, we note that the receipt was properly identified. Officer Huber identified the receipt as a document obtained from Price's wallet during an inventory search. Whether the document was actually an official pager activation receipt or something else was irrelevant. Instead, the pertinent authentication involved the circumstances under which the paper was found. Consequently, the document was properly authenticated as what the State claimed it was, i.e., a piece of paper taken from Price's wallet. See, Evid. R. 901(A) (indicating that requirement of authentication as a condition precedent to admissibility is satisfied by "evidence sufficient to support a finding that the matter in question is what its proponent claims").
Based on the preceding discussion, the second assignment of error is overruled.
Because both assignments of error have been overruled, the judgment of the trial court is affirmed.
WOLFF P.J., and YOUNG, J., concur.